All right, our third case for this morning is Dieffenbach v. Barnes & Noble. And we will hear first from Mr. Shork.  Good morning, your honors. May it please the court, my name is Eric Shork and I represent plaintiff appellants Heather Dieffenbach and Susan Winstead in this appeal. This appeal raises three main issues. The first issue is whether Heather Dieffenbach, after shopping at a Barnes & Noble store in California that was equipped with a pin pad that was compromised by criminals, through which the criminals stole the information. Barnes & Noble has admitted that some of the information was used to commit fraud. Now, Dieffenbach is the one who had the debit card, so she actually has money pulled from her account for a few days? Yes, that's correct, your honor. She had money pulled from her account, she was unable to use it for three days. And just under the plain letter of the law in California, which requires a statutory standing requirement for an unfair competition claim, that constitutes a loss of money or property. Which is all that's required to state a claim under the UCF. So if my bank's ATM system is down for a long weekend, I've got a claim under the UCL? No, I would not stretch it to that point. Why not? But money was stolen from your bank account, which is exactly what happened here. And you were unable to access that money. The remedy for that would be restoration, right? Which happened three days later in this case. So for three days she was unable to access any money. So you're saying she suffers a theft, basically, is what you're saying, for three days. And I take it you're analogizing it to the fact that maybe some people embezzle money from their employer, and the fact that they pay it back later doesn't mean that there wasn't an embezzlement. It's still illegal. And you're saying there's still loss. It's still illegal to embezzle, right? It's absolutely illegal to embezzle. But also the ability to access funds, even for a short period of time, has value. So was there any proof of that? I could imagine hypotheticals where I think you would have a strong case. So if money is taken from somebody's account because of a debit card, and let's say you've set up an automatic payment of your rent. And so they go to pull the rent, but the money isn't there because of the skimming. Even though the money gets put back later, you, in the meantime, would have suffered a dishonor of the rent automatic payment. But I didn't know whether you needed to plead something like that. I didn't see any further evidence along those lines, although I realize this is at a very early stage. We didn't plead specifics along those lines. The argument that we'd made, and it was endorsed by at least one California court, was that the ability to access your own money has value. I mean, the money was taken out of Daffenbach's account. It has value. She couldn't access it for three days. And that constitutes a loss of money. What are the damages? The damages were that money was stolen from her. She later got it back. Was it an interest-bearing account? Three days of interest on an account, probably paying less than 1% per year? Under the UCL, that would be sufficient. The UCL's loss of money requirement is a statutory standard requirement that was added just to ensure that private parties have an interest in the cases that they're bringing. There's an old adage in the law that the law doesn't care about trifles, right? There is, but on that issue. There's actually California case law supporting that any trifle of injury is sufficient to state a claim under the UCL. And that case law comes from which court are you referring to? I believe it's cited in our appeals. I know that the California Supreme Court addressed this issue. It's addressed this issue. I think most of it relies on the Kwikset decision. You know what? It might be in the polybrief. Well, there's Kwikset is the 2011 California decision. Well, I mean, since we're talking about whether a claim has been stated, we're not talking about Article III standing. There's injury, in fact, if you've lost some money. And California seems to have said, I'm looking at this Kwikset quote that you had in your brief, lots of ways that you might suffer economic injury from unfair competition. You seem to be under the third, be deprived of money or property. It doesn't say permanent deprivation. Yeah, and I'd agree with that. But it's a pretty small injury, though, that she has. And for Winstead, just before you sit down, she's the one with the credit card who's without her credit card for a few days. And you're looking at what to show her actual injury. Well, Winstead was also a victim of credit card fraud. Right, it's the credit card fraud. And she's the one that you're saying, well, she extended the identity theft protection plan that she had, but the district court thought that was pretty speculative to show actual harm. And she's also, maybe both of them, but at least one of them is raising this. When I walked into Barnes & Noble, I thought I was buying not just a book, but also a certain degree of protection when I tender my debit or credit card. That, I mean, we've been cautious about that theory, I'll just say. And I understand that. Winstead's primary theory of recovery is the reasonable mitigation costs. The $16.99 a month. And she alleges that renewing the credit monitoring service, the breach was a crucial factor involved in that, and that she had planned on not renewing it otherwise. And so, and it's covered in our briefing, but reasonable mitigation expenses have long been recognized as recoverable under Illinois law. Counsel, let me just ask you to address what's really concerning me most about these cases. I think since we started dealing with some of these cases, virtually every adult who has been engaged in economic activity in the United States has had their information compromised in one way or another. Every federal judge has had that happen through the Federal Office of Personnel Management. Given all the protections that are in place against actual loss for fraudulent use of information from credit cards, the reimbursement that happens in these kinds of cases from the merchant, what is the social value of class action litigation on behalf of people who haven't actually lost any money, but who have these very, well, I think I want credit monitoring service, and so on. What does this add to the picture? Well, I think the social value is principally twofold. Number one is class action litigation serves as a deterrent effect. That goes without saying. And what marginal deterrent effect, given that the other economic actors already have duties and ordinarily do step in and reimburse people for losses? And that gets to the second is, from my experience, and we've done some of these cases, these people do suffer real harm. Are you talking about, like, sitting down and sorting out, you know, the time value of working through the fraud department and things like that? No, I'm talking about more than that. I'm talking about people who, in certain cases, credit card companies, although it's general practice to do so, aren't required to refund money over a certain amount. I mean, there could be a charge. But you've sued Barnes & Noble, though, not MasterCard or whatever kind of card they were carrying. So your theory has to be that if Barnes & Noble is liable for the skimming, the unfortunate results of the skimming, that they will somehow have an incentive to have a better system. Is that right? Well, yes, that's true. But also, we're seeking recovery on behalf of plaintiffs in the class who, for instance, Barnes & Noble didn't offer free credit monitoring, which usually comes with identity theft insurance in this case, which is usually pretty standard. Right. So the plaintiff, Winstead, renewed hers. So that would be a potential remedy you would seek, just identity theft. It looks like I've got about 30 seconds. Yeah, you have very little left, so you can wait at this point. I may round it up to a minute for you. Very good. Mr. Chernoff. May it please the Court? Good morning. My name is Ken Chernoff. I represent the defendant, Appellee Barnes & Noble, in this matter. And, Your Honor, I think it's appropriate that Your Honor is on this panel. You've had to deal with ---- Fortuitously. Were you here for the earlier discussion? You heard us tell your predecessor at the Rostrum that ad hominem observations are inappropriate, and then you stand up and immediately make one. My apologies, Your Honor. But my point was important, which is that this Court has had to grapple with data breach class actions in the past, and this case comes to the Court five years after the underlying incident, after four iterations of the complaint. Two of the four individual plaintiffs have voluntarily walked away from the case, and we're now down to what is fundamentally a case of one individual plaintiff who pursues her claims under Illinois state law and the other pursuing her claims under California state law. And in that light, this case is fundamentally different from the Neiman Marcus and the P.F. Chang's case that Your Honor has had to deal with. The Court has dealt with, yes. The Court has dealt with in connection with the constitutional standing question. In both of those cases, the Court reserved the question of whether the claim had been stated under Rule 12b-6 under state law. But the Court has addressed those issues in the Pisciatta case, which preceded both the Neiman Marcus and the P.F. Chang's case. And in that case, the Court, as the Court below here did, held that although Article III standing may exist, sufficient injury, in fact, having been alleged, the case was nonetheless appropriately dismissed for failure to state a claim. So here's my question. Let's focus on Dieffenbach and the California law. Now, it certainly would be the case that if California wanted to have a law that says, we just think this is bad and we don't really care if anybody's lost something or not, California citizens can go to California courts. That's California's business, how they want to use their courts. Once you're in federal court, you have to satisfy federal Article III standing requirements. But California seems to have added that to its law. So even though it's a very tiny injury, perhaps, there is enough of an injury, whether it's the kinds of things the Court recognized in the Remiges case, whether it's the loss of the use of your money for a certain number of days or you had to make 65 phone calls and listen to annoying computer menus to, you know, get your situation straightened out, which we've probably all had to do at some point. We said that's, you know, that's an injury. And so why doesn't that at least get you over 12b-6 in this case? So, Your Honor, the – And again, I'm just focusing for the moment on the California case. I think the Illinois case has some distinctions. Correct. I understand. So the California claim is brought under the unfair competition law. The unfair competition law, as the Court may know, was amended several years ago to add a specific provision, a statutory standing provision that provides that a claim can only be brought if the plaintiff alleges a loss of money or property. Right. The quick set decision, which the Court was discussing previously with counsel, specifically says that although it gives some examples, it must be an economic injury. Here, in the case of Barr, although there was some discussion with counsel about loss of money, loss of use of money, the Court's questions were apt. There's no allegation in the complaint that the plaintiff actually lost a penny, even a trifle. There's no lost interest alleged. There's no loss of money that was funds that were not returned, no fees that were incurred, nothing. Right. So you would agree that if they had said in their complaint, $100 was taken out of her account and she had an automatic payment set up with her electric company and it came up short because her account was $100 short, even though they later restored the $100, she suffered an injury because the electric company couldn't draw the money. Well, that hypothetical... Well, I mean, a lot of people do automatic bill payment. It's very convenient. And they think the money's there in their account. They're being responsible, and all of a sudden some criminal drains a certain amount of money out. And then there would probably be a fee that the electric company would charge for the insufficient fund draw. So I would think if the complaint had had such an allegation, you wouldn't have a very good position. I think Your Honor is correct. If the complaint had alleged a loss of money or property, for example, in the hypothetical the court just gave about inability to make a payment to the electric company and the... Even though the money's later restored, at the moment they go try to draw their money, there's not enough in there. And Your Honor posited that they incurred a fee, say a late fee or a penalty or somehow some other fee. That would be a loss of money or property. I would agree, Your Honor. And, indeed, that's why I began by saying we're five years in, four versions of the complaint. The core issue in this case has always been was there a damage incurred by any of the plaintiffs. If the standard, though, is along the lines you're discussing, that something more is needed, I would assume you would treat that as giving you a very good argument against class certification. We may well. We may well. Which would make any remedy essentially unavailable, if classes can't be certified, right? It's interesting, Your Honor. These cases, these data breach class actions, rarely get to class certification. They rarely get to the class certification stage. So the jurisprudence on that is... Not yet. We'll see. Not yet. We're going to have plenty of opportunities, perhaps, in the future. Maybe so. But I do think that we're seeing the natural evolution of these cases. So the first wave of cases that got their way to federal court were frequently decided on standing grounds. Sometimes they were dismissed on standing and reversed or vice versa. Now we're facing a series of cases, like the one at Barr, where the core issue on appeal is whether the plaintiff has alleged sufficient facts to state a claim under the applicable state law. And here in both the Illinois context, which I know we'll get to, and the California context, we have state law that is more strict than the injury in fact requirement for purposes of establishing a case of controversy. That may well be true with respect to the UCL. I forgot what it stands for. Unfair competition law. But the Customer Records Act seems to be broader. So the Customer Records Act, Your Honor, the law is thinner on the Customer Records Act, but the remedial provision of the Customer Records Act, under which this claim was brought, requires for statutory standing that a plaintiff has suffered an injury in order to bring a claim for damages. In the Boorstein case that we cite, the court held that that means the plaintiff has to allege actual economic harm. Same standard applies. And she is at least alleging that. Indeed, even, well, certainly Dieffenbach takes the straightforward position that if somebody has stolen money out of my bank account, then I've lost my money for that period of time. And even if somebody, rather, the credit card company or Barnes & Noble or someone later restores the money to the bank account, the bank has had to go through all sorts of hassle because of that. You know, the loss falls somewhere, and it's temporarily falling on the consumer. So that's an allegation of a loss of money. And Winstead in Illinois says, you know, the cost of credit monitoring is a concrete loss. Now, in some of the other cases, in the Remedios case, for example, that was one of the things Neiman Marcus undertook to do, so we didn't have to consider that. So just to close out the Customer Records Act, and then maybe I'll address the Illinois statute briefly. So the standard, to bring this all together, of the actual economic harm that Burstein describes, in the second of the Sony cases, which is the one at 996 F-sub-second, the court refers to that standard as one of actual damages. The Dugas case requires proof of damages. Those are the same articulations that the Kwikset court used in the UCL context, economic injury. Kwikset talks about economic injury for UCL. Burstein talks about actual economic harm. So, again, just as the discussion before focused on whether there was a loss of money or property... So how long can you be without your money before it starts counting as a loss? Well, that's a very good question, Your Honor. In this case, it presents the facts that it presents, and the allegations are that there was no lost interest, there was no unreimbursed fee, there was no unreimbursed charge of any sort. But deprivation of the use of it, in your view, doesn't matter, at least if it's only a couple of days. I guess if it were a week or a month or a year... Under some circumstances, there may be a time value of money. No such allegation... Just the lack of access to your own money, you don't think that that counts as a loss? Forget about interest. Sorry, Your Honor, that may count as an injury for purposes of Article III standing. Why isn't it also a loss? You didn't have your money for a year. You had to go do something, do without. Buy those tickets to Hamilton, you know, whatever. As Your Honor noted, there is no claim that the money was in fact lost. It was promptly returned to Ms. Ethan Boxic. Well, I know, and I'm just probing, what does promptly mean? What work is that doing, and why should we trivialize lack of access to money and just say, well, you should be able to put up with this much but not that much? And in another case, it may be that there is a way to put a dollar value next to that. This is not that case. May I briefly address the Illinois... Sure, yeah, I'm going to round up his time to a full minute, so we'll give you a little more. Thank you, Your Honor. So just briefly, on the Illinois claim, which is brought under the Illinois Consumer Fraud Act, as counsel said, their main contention is that they incurred the actual damage component of the statute by virtue of the plaintiff's decision to continue to subscribe to credit monitoring that she had previously subscribed to for independent reasons before the Barnes & Noble incident even occurred. Putting aside the causation question, which I'm happy to get to in a second, we're in a situation here where we have an unusually robust amount of case law under the Illinois Consumer Fraud Act, both in the state appellate courts of Illinois and also in the federal courts and the district here holding that credit monitoring as a means to mitigate the risk of future injury is not considered actual damages for purposes of the statute. And, indeed, here it's particularly apt, and the Michaels case that we cite talks about this. You know, well, here, first of all, the plaintiff, Ms. Winstead, alleges that she canceled her credit card when she learned of the incident. Therefore, because she alleges only that she gave her credit card, no other personal information was transmitted to Barnes & Noble as part of the transaction. There is no risk of future harm. It has been terminated. So purchasing credit monitoring would be beside the point at this point. My time is up, Your Honor. Your time is up. We will look at your brief or anything else, and we thank you. We appreciate it. Thank you very much, Your Honor. So I promised to round his time up to a minute if we can do that. Okay, I've got really just two quick points on rebuttal. The first one relates to the California Customer Records Act. In our brief, we relied upon the Adobe case, which applied an injury in fact standard to the injury requirement under the act. Both the Bornstein and Miller cases that opposing counsel alluded to also apply an injury in fact standard. They cite almost exclusively to Article III decisions and actually analyzed informational injury. So I'm not sure. I mean, none of those decisions support that economic injury is required under the CRA. The second point is that the law in Illinois on actual damages for credit monitoring expenses is not robust. There's really only one decision, which is CUNY, and CUNY relies upon two decisions which don't deal with it really, especially in circumstances like this. And another decision, which is Roe, which only relates to harm that would be incurred for credit monitoring expenses in the future. At least that's the context in which Roe analyzes the credit monitoring expenses. So the legs that CUNY stand on really, and all the other cases rely upon it, don't support that credit monitoring expenses, reasonable mitigation expenses aren't actual damages under Illinois law. Thank you for your time and attention. All right. Thank you. Thank you to both counsel. We'll take the case under advisement.